**ALSTON & BIRD LLP**
**Karl Geercken (KG 5897)**
**F. Paul Greene (FG 1837)**
**90 Park Avenue**
**New York, New York 10016**
**(212) 210-9400**

*Attorneys for Plaintiff*
*MEADOWBROOK MEAT COMPANY, INC.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
JUN 25 2007
U.S.D.C. S.D. N.Y.
CASHIERS

JUDGE KRAM

**'07 CIV 5979**

Civil Action No.

**JURY TRIAL DEMANDED**

---------------------------------------------------------------- X

MEADOWBROOK MEAT COMPANY,
INC.,

               **Plaintiff,**

     – against –

PHOENIX PARTNERS LP, PHOENIX
PARTNERS CORP., JOSEPH DEL
VALLE, MICHAEL CARSTENS,
MICHAEL GROWNEY, DONNA DEL
VALLE, VANQUISH ACQUISITION
PARTNERS, LLC, CDG ENTERPRISES
and SOUTHEAST CRUISE HOLDINGS,
LLC,

               **Defendants.**

---------------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## COMPLAINT

    Plaintiff, by and through its attorneys, Alston & Bird LLP, for its complaint

against Defendants, alleges as follows:

### Allegations Common to All Counts

#### Nature of the Action

    1.    This action is brought by Meadowbrook Meat Company, Inc. ("MBM" or

"Plaintiff"), for declaratory judgment and money damages against Phoenix Partners LP,

Phoenix Partners Corp., Joseph Del Valle, Michael Carstens, Michael Growney, Donna

Del Valle, Vanquish Acquisition Partners, LLC, CDG Enterprises, and Southeast Cruise Holdings, LLC, (collectively "Defendants") as a result of: (i) liability incurred by Phoenix Partners LP under a Guaranty in favor of Proficient Food Company, Inc. ("Proficient Food") (a predecessor entity to MBM), executed by Joseph Del Valle on behalf of Phoenix Partners LP, (ii) fraud perpetrated on Proficient Food by Joseph Del Valle and other Defendants, and (iii) fraudulent conveyances made by Phoenix Partners LP with the intent to defraud creditors or while Phoenix Partners LP was insolvent.

### Jurisdiction and Venue

2.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332 because this is an action in part for declaratory judgment and because the amount in controversy exceeds $75,000 exclusive of interest and costs, and Plaintiff and Defendants are citizens of different states.

3.       Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

### The Parties

4.       Plaintiff MBM is a corporation organized under the laws of the state of North Carolina with its principal place of business at 2641 Meadowbrook Road, Rocky Mount, North Carolina  27801.  MBM is in the business of supplying food and other goods to customers in the food service industry.

5.       MBM is the successor in interest of Proficient Food, an entity likewise in the business of supplying food and other goods to customers in the food service industry.

6.      Defendant Phoenix Partners LP ("PPLP") is a limited partnership organized under the laws of the state of Delaware, with its principal place of business at 230 Park Avenue, New York, New York 10017.

7.      Defendant Phoenix Partners Corp. ("PP Corp.") is a shell corporation that purportedly acts as a General Partner of PPLP, is organized under the laws of the state of Delaware, and lists its mailing address as 1839 Celeste Drive, Wall, New Jersey 07719. Defendants Joseph Del Valle and Michael Carstens are the sole shareholders of PP Corp., and hold its stock in equal shares.

8.      Defendant Vanquish Acquisitions Partners, LLC ("Vanquish") is a limited liability company organized under the laws of the state of Delaware, with its principal place of business at 590 Madison Avenue, 21st Floor, New York, New York 10021.

9.      Defendant CDG Enterprises ("CDG") is, on information and belief, a limited liability company organized under the laws of the state of Delaware, of which Carstens, Del Valle, and Growney are members.

10.      Defendant Southeast Cruise Holdings, LLC ("Southeast") is a limited liability company organized under the laws of the state of Delaware, and, upon information and belief, has its principal place of business in New York.

11.      Defendant Joseph Del Valle ("Del Valle") is a Partner and Co-Managing Director of defendant PPLP, resides at 150 W. 56th Street, New York, New York, 10019, and maintains a business address at 590 Madison Avenue, New York, New York, 10022. Mr. Del Valle is also a 50% shareholder in defendant PP Corp., as well as its Director, Chairman, and President. Upon information and belief, Del Valle is also a member, officer, director, partner or owner of Vanquish, CDG, and Southeast Cruise Holdings.

12.     Defendant Michael Carstens ("Carstens") is a Partner and Co-Managing Director of defendant PPLP, and resides at 425 E. 58th Street, New York, New York 10022. Carstens is also a 50% shareholder in defendant PP Corp., as well as its Secretary/Treasurer. Upon information and belief, Carstens is also a member, officer, director, partner or owner of Vanquish, CDG, and Southeast Cruise Holdings.

13.     Defendant Michael Growney ("Growney") is General Counsel of defendant PPLP, and upon information and belief, is a Partner of PPLP. Upon information and belief, Growney resides in the state of New York. Also upon information and belief, Growney is a member, officer, director, partner, General Counsel or owner of Vanquish, CDG, and Southeast Cruise Holdings.

14.     Defendant Donna Del Valle is or was married to Del Valle and resides at 1839 Celeste Drive, Wall, New Jersey 07719.

### Factual Allegations Common to All Counts

The Phoenix Entities

15.     PPLP was formed on March 22, 1994 by Del Valle and Carstens, with no initial capitalization. The Certificate of Limited Partnership for PPLP lists a shell corporation, PP Corp., as PPLP's General Partner.

16.     PP Corp. was formed the same day as PPLP, purportedly to act as the General Partner of PPLP. Like PPLP, PP Corp. was also formed with no initial capitalization.

17.     The business plan of PPLP was to identify entities as potential acquisition targets, attract investors to supply the funding for such activities, arrange sufficient debt

or equity investment to finance such acquisitions, and then sell the acquired entities or their assets at a profit.

18.     At no time has PPLP had sufficient assets to effect any such acquisition, or to fund its own activities without the influx of capital through limited partner or other investment.

19.     PPLP has been inactive since approximately June 2001, when substantially all of its liquid assets were paid out to Del Valle, Carstens, Donna Del Valle and others in the form of "draws" and other payments (each payment a "Draw").

20.     Up until that point, the daily operations of PPLP had been conducted and overseen by Del Valle and Carstens. Del Valle and Carstens bore the titles of "founding partners" and "co-managing directors" of PPLP.

21.     Del Valle was responsible for the sales side of PPLP's operations. He would identify acquisition targets, drum up investment support, arrange debt or equity financing, and would act as the primary negotiator in deals in which PPLP took part.

22.     Del Valle also consistently exercised control over and held himself out to be a general partner of PPLP.

23.     Carstens provided financial analysis necessary to evaluate potential acquisition targets, and also served as treasurer and records custodian of PPLP.

24.     Carstens has also exercised control over and has been held out as a general partner of PPLP.

25.     Michael Growney was general counsel to PPLP and, upon information and belief, had the practice of reviewing all legal documents into which PPLP entered.

26.    Donna Del Valle regularly received payments from PPLP in the form of Draws.

Del Valle and Carstens Dominated and Controlled both PPLP and PP Corp.

27.    Upon information and belief, Del Valle and Carstens, and other Defendants, did not operate either PPLP or PP Corp. as separate *bona fide* business entities but, instead, operated each for Del Valle's and Carstens's own benefit, or for the benefit of other Defendants.

28.    Del Valle and Carstens, and, on their behalf, PP Corp., failed to adequately capitalize PPLP.

29.    Upon information and belief, Del Valle and Carstens commingled their own assets with those of PPLP.

30.    Both Carstens and Del Valle had individual signature authority on the bank accounts held by PPLP, and could and did regularly withdraw funds form those accounts without the other's approval, or the approval of any other PPLP Partner.

31.    From time to time, Carstens would make undocumented, interest-free "loans" to PPLP, or allegedly advance undocumented expenses for PPLP, for which he took "repayment" whenever he saw fit. Carstens was not required to seek approval from Del Valle or any other PPLP Partner before he made such withdrawals. Del Valle was nevertheless aware of Carstens's practice of making such withdrawals.

32.    PPLP's finances and payroll, including the practice of taking irregular Draws, were controlled entirely by Del Valle and Carstens.

33.    Upon information and belief, Del Valle and Carstens diverted PPLP business opportunities to other entities of which they are currently members, including Vanquish, CDG, and Southeast.

34.    Del Valle and Carstens are the sole shareholders of PP Corp., and PP Corp. maintains no separate or accurate books and records.

35.    Del Valle and Carstens wholly failed to capitalize PP Corp.  Upon information and belief, it never had a bank account or owned any liquid assets.

<u>Vanquish, CDG, and Southeast Are the Successors of PPLP</u>

36.    Upon information and belief, Vanquish, CDG and Southeast have paid expenses incurred by PPLP since 2001 including:  (i) judgments rendered against PPLP and its Partners individually, (ii) attorneys' fees incurred by PPLP, and (iii) other operating expenses incurred by PPLP.

37.    Upon information and belief, Vanquish maintains certain of PPLP's records.

38.    Upon information and belief, Del Valle, Carstens, and Growney conduct PPLP business at the offices of Vanquish, CDG or Southeast.

39.    Upon information and belief, Vanquish, CDG, and Southeast, through their members Del Valle, Carstens, and Growney, have usurped or otherwise appropriated business opportunities in which PPLP had an interest.

40.    Upon information and belief, Vanquish, CDG, and Southeast conduct similar business to that conducted by PPLP, and have substantially similar clients and maintain substantially similar business relations to those that had been maintained by PPLP.

- 7 -

41.    Upon information and belief, Del Valle, Carstens, and Growney provide the same services to Vanquish and Southeast that they provided to PPLP.

42.    Del Valle has identified Vanquish in writing as a successor-in-interest to PPLP.

Project Cypress

43.    Non-party Cypress Restaurants, Inc. and other affiliated Cypress companies ("Cypress") owned numerous Denny's Restaurants and were a significant customer of Proficient Food.

44.    Over the course of their over decade-long relationship, Proficient Foods made deliveries to Cypress several times per week, and Cypress would make payments for those deliveries several times per week.

45.    However, in 2000 and 2001, Cypress began having difficulty making payments within credit terms established by its relationship with Proficient Food.

46.    About the same time, PPLP identified Cypress as a possible acquisition target, and began a process of comprehensive due diligence to investigate the viability of acquiring Cypress.

47.    On April 25, 2001, PPLP (through a wholly-owned holding company, Phoenix Hospitality Holdings, LLC) entered into an "Amended and Restated Reorganization of the Cypress Companies" (the "Reorganization Agreement") pursuant to which PPLP was to attempt to negotiate a restructuring of Cypress's debt with Cypress's creditors.  The Reorganization Agreement was signed by Del Valle.

<u>The Guaranty</u>

48.    Cypress began to have more and more difficulty making payments for deliveries from Proficient Food on time.  As a result, in April of 2000, Proficient Food saw the need for a third-party Guaranty of any current or future Cypress debt as a prerequisite for any future deliveries to Cypress (the "Guaranty").

49.    Discussions regarding the Guaranty began between Proficient Food and PPLP in April of 2001.

50.    By May of 2001, Proficient Food and PPLP had come to an agreement on the terms of the Guaranty, drafts of which were circulated among the parties for final comment and execution no later than May 2, 2001.  The terms agreed to by Proficient Food and PPLP included a statement of PPLP's net worth and a provision that Proficient Food would be able to collect reasonable attorneys' fees incurred in enforcing the Guaranty.

51.    Upon information and belief, PPLP and its Partners stood to profit from Proficient Food's acceptance of the Guaranty, because any interruption in deliveries to Cypress would have effectively shut Cypress down, and scuttled the Reorganization Agreement.

Proficient Food Is Fraudulently Induced to
Advance Further Deliveries to Cypress and
<u>Forego Collection on Cypress's Debt</u>

52.    Throughout the negotiation of the terms of the Guaranty, PPLP, through Del Valle, affirmatively represented to Proficient Food, both orally and in writing, that it was solvent and that its net worth was far in excess of the debt then owed by Cypress to Proficient Food, which then totaled in excess of $1 million.

53.     Proficient Food made clear to PPLP and Del Valle that such a statement of solvency and net worth was a pre-requisite for future deliveries of product to Cypress, and that Proficient Food would rely on PPLP's and Del Valle's representations regarding solvency and net worth of PPLP in determining whether to (i) continue delivering product to Cypress and (ii) forego immediate collection on Cypress's debt.

54.     Initially, PPLP represented that its net worth was in excess of $25 million. In the final draft of the Guaranty, revised and executed by Del Valle, PPLP stated that it had a "tangible net worth . . . greater than $20,000,000."

55.     Upon information and belief, at no time during its existence did PPLP have a net worth of greater than $1 million.  Neither Carstens, Del Valle, Growney, nor anyone else associated with PPLP ever disclosed this to Proficient Food.

56.     As of May 2, 2001, PPLP's tangible net worth, measured by assets in its bank accounts, was less than $5,000.

57.     On May 2, 2001, Del Valle read and signed the Guaranty, containing (i) the representation that PPLP had a net worth in excess of $20 million, and (ii) the provision that PPLP was bound to pay "all costs and expenses incurred by [Proficient Food] in the collection and enforcement of this Guaranty including the reasonable fees and disbursements of counsel to [Proficient Food] if collection is sought by or through an attorney."

58.     Upon information and belief, when Del Valle signed the Guaranty, he knew the representation contained therein regarding net worth of PPLP to be false.

59.     Upon information and belief, before it was signed, the Guaranty was reviewed in draft form by Del Valle, Carstens, and Growney.  It was also reviewed in its final form by Del Valle, Carstens, and Growney.

60.     Upon information and belief, when Del Valle, Carstens, and Growney reviewed the Guaranty in draft or final form, each knew the representation contained therein regarding net worth of PPLP to be false.

61.     Proficient Food relied on PPLP's and Del Valle's representation regarding net worth of PPLP contained in the Guaranty in (i) accepting the Guaranty, (ii) continuing to make deliveries to the financially distressed Cypress, and (iii) foregoing immediate collection on Cypress's debt from Cypress.

62.     During the course of negotiation of the Guaranty and immediately thereafter, PPLP received several infusions of cash, allegedly from limited partner investors.  During that same time period, however, Del Valle and Carstens took and Donna Del Valle received a series of alleged Draws from PPLP's assets, effectively cashing out all PPLP's assets in a four-month period—March to June 2001.

Carstens and Del Valle Loot PPLP

63.     Deposits into PPLP accounts between March and June 2001 amounted to over $434,000.

64.     Draws taken by Del Valle and Carstens or received by Donna Del Valle during that time period amounted to over $120,000.

65.     These Draws were taken despite the express provision of the Guaranty prohibiting them.

66.    Also during that time period, Carstens took what he characterized as "repayment" of undocumented, interest-free loans he had allegedly made to PPLP, and reimbursement of alleged business expenses, in the amount of $102,000.

67.    In addition, Carstens made several withdrawals during that time period to "Cash," which withdrawals Carstens transferred to Growney, allegedly for the provision of legal services.

68.    Upon information and belief, the Draws and other withdrawals made by or on behalf of Del Valle and Carstens and other Defendants were made at a time when PPLP was either insolvent or when Del Valle and Carstens knew PPLP would imminently incur liability under the Guaranty, rendering PPLP insolvent.

69.    At no time did Del Valle, Carstens, Growney, or anyone at PPLP provide notice to Proficient that PPLP's tangible net worth was less than $20 million, which notice was expressly required by the Guaranty.

Judgment Against Phoenix Partners LP

70.    On September 18, 2001, Cypress filed for bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida.

71.    During the course of the Cypress bankruptcy it became clear that Cypress would not be able to pay a significant portion of the debt covered by the Guaranty.

72.    On November 2, 2001, Proficient Food brought an action in the Supreme Court of the State of New York against PPLP to recover under the Guaranty for the portion of the debt on which Cypress defaulted.

73.    As a result of that action, Proficient Food received a judgment against PPLP in the amount of $797,188.24 on April 4, 2005 (the "Judgment").

74.    Neither PPLP, nor its General Partner PP Corp., have sufficient funds to satisfy the Judgment as substantially all of PPLP's assets were withdrawn in March, April, May, and June of 2001, and PP Corp. was never adequately capitalized.

## COUNT I
### DECLARATORY JUDGMENT
### PP CORP., DEL VALLE, AND CARSTENS ARE LIABLE FOR THE JUDGMENT AGAINST PPLP
### (against Phoenix Partners Corp., Del Valle, and Carstens)

75.    MBM repeats and realleges paragraphs 1 through 76 as if here fully set forth.

76.    PP Corp. is a General Partner of PPLP.  Del Valle and Cartens are General Partners of PPLP or have conducted themselves in such a manner so as to warrant treatment as General Partners of PPLP.

77.    As such, PP Corp., Del Valle, and Carstens are liable for all debts and obligations incurred by PPLP.

78.    As a result, MBM is entitled to judgment in its favor against PP Corp., Del Valle, and Carstens declaring that each is jointly and severally liable for the Judgment and Proficient's reasonable attorneys' fees in collecting on the Guaranty.

## COUNT II
### DECLARATORY JUDGMENT
### PIERCING THE ENTITY VEILS OF PP CORP. AND PPLP
### (against Del Valle and Carstens)

79.    MBM repeats and realleges paragraphs 1 through 76, and 78 through 79 as if here fully set forth.

80.    Upon information and belief, Del Valle and Carstens, among other things, dominated and controlled PP Corp., failed to adequately capitalize PP Corp., or operate PP Corp. as a *bona fide*, separate business entity, commingled their own assets with those

of PP Corp., and operated PP Corp. solely for their own benefit, or for the benefit of other Defendants.

81.    Upon information and belief, Del Valle and Carstens, among other things, dominated and controlled PPLP, failed to adequately capitalize PPLP, or operate PPLP as a *bona fide*, separate business entity, commingled their own assets with those of PPLP, and operated PPLP solely for their own benefit or for the benefit of other Defendants.

82.    Upon information and belief, Del Valle and Carstens used the corporate form of PP Corp. as a vehicle to defraud Proficient Food, inasmuch as they induced Proficient Food to (i) accept the Guaranty, (ii) continue to ship product to Cypress, and (iii) forego immediate collection of Cypress's debt from Cypress on the basis of knowing misrepresentations by Del Valle and Carstens.

83.    As a result, MBM is entitled to judgment in its favor against Del Valle and Carstens declaring that they are jointly and severally liable for the debts and obligations of PP Corp. and PPLP, including the Judgment and Proficient's reasonable attorneys' fees in collecting on the Guaranty.

### COUNT III
### DECLARATORY JUDGMENT
### CARSTENS'S UNDOCUMENTED, NO-INTEREST LOANS WERE CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP
#### (against Carstens)

84.    MBMs repeats and realleges paragraphs 1 through 76, 78 through 79, and 82 through 84 as if here fully set forth.

85.    Carstens made undocumented, no-interest "loans" to PPLP at his own discretion, without the request of PPLP.

86.    Upon information and belief, these "loans" were in fact capital contributions, made to sustain operations of PPLP, and were wrongfully withdrawn by Carstens.

87.    As a result, MBMs is entitled to judgment in its favor against Carstens declaring that the aforementioned loans were capital contributions to PPLP, and as such should have been used to satisfy the debts and obligations of PPLP.

### COUNT IV
### DECLARATORY JUDGMENT
### VANQUISH, CDG, AND SOUTHEAST ARE SUCCESSORS
### IN INTEREST OF PPLP
### (against Vanquish, CDG, and Southeast)

88.    MBM repeats and realleges paragraphs 1 through 76, 78 through 79, 82 through 84, and 87 through 88 as if here fully set forth.

89.    Upon information and belief, Vanquish, CDG, and Southeast are successors in interest of PPLP, as they continue operations of PPLP, whether in their own names or in the name of PPLP, and have usurped or otherwise acquired business opportunities held by PPLP, or in which PPLP had an interest.

90.    As a result, MBM is entitled to judgment against Vanquish, CDG, and Southeast declaring that they are jointly and severally liable for the debts and obligations of PPLP as successors in interest of PPLP, including the Judgment and Proficient's reasonable attorneys' fees in collecting on the Guaranty.

### COUNT V
### FRAUD
### (against PPLP, Del Valle, Carstens, and Growney)

91.    MBM repeats and realleges paragraphs 1 through 76, 78 through 79, 82 through 84, 87 through 88, and 91 as if here fully set forth.

92.    Upon information and belief, PPLP, Del Valle, Carstens, and Growney knew that the representations regarding PPLP's net worth made to Proficient Food, and contained in the drafts and final, executed version of the Guaranty, were material misstatements of then existing or pre-existing fact and false when made.

93.    Upon information and belief, PPLP, Del Valle, Carstens, and Growney made these misstatements of fact, or allowed them to be made on their behalf or for their benefit, with the intent to induce Proficient Food to (i) accept and otherwise enter into the Guaranty, (ii) continue to ship product to Cypress, and (iii) forego immediate collection of Cypress's debt from Cypress.

94.    Upon information and belief, after the Guaranty was executed, Del Valle, Carstens and Growney failed to disclose to Proficient Food material information concerning net worth and financial condition of PPLP with the intent to induce Proficient Food to continue shipping product to Cypress and to forego immediate collection of Cypress's debt.

95.    Proficient Food reasonably relied on such misrepresentations and omissions in (i) accepting and otherwise entering into the Guaranty, (ii) continuing to ship product to Cypress, and (iii) foregoing immediate collection of Cypress's debt from Cypress.

96.    Proficient Food was damaged as a result of its reasonable reliance on the representations regarding PPLP's net worth.

97.    The actions of PPLP, Del Valle, Carstens, and Growney were intentional and willful so as to justify an award of punitive damages against them.

98.     As a result, MBM is entitled to judgment in its favor against PPLP for compensatory and punitive damages in an amount to be determined at trial.

### COUNT VI
### FRAUDULENT CONVEYANCES
### (against Del Valle, Carstens, Growney, and Donna Del Valle)

99.     MBM repeats and realleges paragraphs 1 through 76, 78 through 79, 82 through 84, 87 through 88, 91, and 94 through 99 as if here fully set forth.

100.     Upon information and belief, at Del Valle's or Carstens's direction, assets belonging to PPLP were conveyed to Del Valle, Carstens, Growney, Donna Del Valle or others for less than equivalent or fair consideration at a time when PPLP either was insolvent or would be rendered insolvent as a result of the conveyance.

101.     Upon information and belief, at Del Valle's or Cartsens's direction, assets belonging to PPLP were conveyed to Del Valle, Carstens, Growney, Donna Del Valle or others with the intent to hinder, delay or defraud either present or future creditors.

102.     In addition, upon information and belief, during this time period Carstens also wrongfully withdrew capital contributions he had made to PPLP.

103.     As a result, MBM, as a creditor of PPLP, is entitled to (i) have the aforementioned conveyances set aside to the extent necessary to permit MBM to satisfy its claims against PPLP as set forth in the Judgment, and (ii) an award of reasonable attorneys fees.

WHEREFORE, Plaintiff MBM demands judgment as follows:

(a) on its first claim against PP Corp., Del Valle, and Carstens, declaring that PP Corp., Del Valle, and Carstens are each jointly and severally liable for the Judgment and MBM's reasonable attorneys fees in collecting on the Guaranty;

(b) on its second claim against Del Valle and Carstens declaring that they are jointly and severally liable for the debts and obligations of PP Corp. and PPLP, including the Judgment and MBM's reasonable attorneys fees in collecting on the Guaranty;

(c) on its third claim against Carstens declaring that the undocumented, no-interest "loans" made by Carstens to PPLP were in fact capital contributions to PPLP, and as such should have been used to satisfy PPLP's debts and obligations;

(d) on its fourth claim against Vanquish, CDG, and Southeast declaring that they are jointly and severally liable for the debts and obligations of PPLP, including the Judgment and MBM's reasonable attorneys fees in collecting on the Guaranty, as they are successors in interest of PPLP;

(e) on its fifth claim against PPLP, Del Valle, Carstens, and Growney awarding it compensatory and punitive damages in an amount to be determined at trial;

(f) on its sixth claim against Del Valle, Carstens, Growney, and Donna Del Valle, setting aside the fraudulent conveyances made to Del Valle, Carstens, Growney, Donna Del Valle, and others by PPLP;

(g) awarding plaintiff MBM its reasonable attorneys' fees and costs expended in this action, together with pre- and post-judgment interest thereon to the extent permitted by law; and

(h) awarding plaintiff MBM such other and further relief as this Court deems just and

proper under the circumstances.

Dated: June 22, 2007

ALSTON & BIRD LLP

By: _____

Karl Geercken (KG 5897)
F. Paul Greene (FG 1837)
90 Park Avenue
New York, New York 10016
(212) 210-9400

*Attorneys for Plaintiff
Meadowbrook Meat Company, Inc.*

LEGAL01/7776892v7